**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | **No. 12-291** |
| **DANIEL JOHNSON** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                      **October 31, 2012**

Before the Court is Defendant Daniel Johnson's motion to suppress. On May 2, 2012, law enforcement officers conducted a warrantless search of Johnson's apartment. The Government argues that Johnson's adult son who resides in the apartment, Damir Johnson, consented to the search. Damir Johnson disputes the Government's claim. The Court held a suppression hearing on August 13, 2012, and allowed the parties to file additional briefs in support of their positions. Based on the record before the Court, the Court concludes that the Government has failed to sustain its burden and will therefore grant Daniel Johnson's motion to suppress with the exception of the motion to suppress the search of his cell phone.

## I.     BACKGROUND

### A.     Initial surveillance

In April 2012, the FBI learned that Daniel Johnson had contacted a cooperating witness about payment for a previous drug transaction.  Johnson had supplied $2,000 for a drug transaction involving a cooperating witness who was provided placebo pills by the Philadelphia Police Department ("PPD"). The cooperating witness sold the placebo pills to a third party affiliated with Daniel Johnson and the cooperating witness reported that Johnson was involved in the drug deal.

Based on instructions from the FBI and the Narcotics Field Unit of the PPD, the cooperating witness agreed to provide Johnson with narcotics rather than money. Johnson and the cooperating witness were recorded over the next several days; Johnson said that he wanted back the money he had supplied in the previous drug deal because the pills were fake. The cooperating witness informed Johnson that he could give him narcotics to substitute for the money owed Johnson.

After several recorded phone conversations, the cooperating witness agreed to meet Johnson in the parking lot of the Rite-Aid Pharmacy at 13th Street and Girard Avenue. At approximately 4:55 p.m. on May 2, 2012, Philadelphia Police Officer Robert Clark and FBI Special Agent Kevin Coleman met with the cooperating witness and gave him two amber pill bottles, both containing placebo pills but appearing to be Oxycodone in dosages of 40 mg and 80 mg. They also provided the cooperating witness with an audio transmitter.

At approximately 5:11 p.m., PPD and FBI officers observed Daniel Johnson leave his residence at 1730 West Girard Avenue. He drove a silver Nissan Titan pick-up truck to the parking lot of the Rite-Aid Pharmacy at 13th Street and Girard Avenue. The FBI and PPD followed Johnson to this location. Four minutes later, Johnson was seen leaving his car and entering the car of the cooperating witness, which was also in the parking lot of the Rite-Aid Pharmacy. Officer Clark and Special Agent Coleman were able to see the cooperating witness's vehicle and were able to hear the conversation between Johnson and the cooperating witness. Johnson told the cooperating witness that he would accept narcotics and that "their slate would be wiped clean as far as the debt that the [cooperating witness] had owed to Mr. Johnson." (Suppression Hr'g Tr. at 21.) Through the transmitter provided to the cooperating witness, Officer Clark heard Johnson say that Johnson preferred "30's," which Officer Clark believed to be 30 mg Oxycodone pills. The cooperating

witness then provided Johnson with one of the amber pill bottles containing placebo pills but appearing to be 80 mg Oxycodone pills. At approximately 5:23 p.m., Officer Clark and Special Agent Coleman saw Johnson exit the cooperating witness's vehicle with amber colored pill bottles similar to the ones provided to the cooperating witness and enter his Nissan Titan. Approximately one minute later, Johnson exited his vehicle without the pill bottles and re-entered the cooperating witness's vehicle. At 5:25 p.m., the cooperating witness gave a pre-arranged signal to PPD officers before he started to leave the Rite-Aid parking lot with Johnson. The cooperating witness's vehicle was stopped and Johnson was arrested by another unit. The scene was secured, and officers opened the door of Johnson's Nissan Titan, where inside they discovered in the middle console one amber pill bottle—the other amber pill bottle was located in the cooperating witness's vehicle—containing placebo pills provided to the cooperating witness.[1] On the passenger seat were two notebooks with handwritten notes about drugs, filled out prescriptions, and two prescription receipts not in Daniel Johnson's name.

### B.    Search of 1730 West Girard Avenue and Interview of Daniel Johnson

Officer Clark and Special Agent Coleman placed Johnson in their vehicle and proceeded to Apartment 3 at 1730 West Girard Avenue. Johnson was told that police were watching his apartment, that he was being arrested, and that officers planned to go to his residence and talk to whoever was there. Johnson told officers that he had a son, Damir Johnson, who was ill, and that his

---

[1] There is a discrepancy between the testimony offered at the suppression hearing and Officer Clark's written arrest report notes, and the property receipt regarding the number of pills provided to the cooperating witness and the number of pill bottles recovered from Johnson's vehicle. At the hearing, however, Officer Clark testified that his Philadelphia Police Department Arrest Report ("PARS") incorrectly stated that two pill bottles were recovered from Johnson's vehicle and that the property receipt from Officer Clark contained an error about from where the bottles were recovered. (Suppression Hr'g Tr. at 79-81.)

son was at the apartment. Special Agent Coleman remained near his vehicle with Johnson while other agents conducted a search of Johnson's apartment. During this time, Special Agent Coleman was advised by officers conducting the search that narcotics and a firearm were recovered from the apartment. Daniel Johnson overheard that officers located a gun at his apartment. At approximately 6:40 p.m., Johnson was provided his *Miranda* warnings, and he signed a consent form waiving his right to remain silent and was interviewed by Special Agent Coleman. During the interview, Johnson informed officers that he bought the gun found in his residence about five years before for protection, and that he did not have a legal permit to carry the weapon. He also reported that the pills found inside his residence and his Nissan Titan were bought from various people. Johnson also said that he would try to sell the pills from the cooperating witness for $20-$25 per pill. He also stated that the names on the prescriptions were the names of the people who sold him pills. While in the vehicle traveling from the Rite-Aid to his apartment, Johnson verbally consented to a search of his cell phone, and he later signed a consent form allowing the FBI to search his cell phone.

### 1.     *Law enforcement's version of the apartment search*

According to Officer Clark, he and other officers knocked on the door of Johnson's apartment, which was opened by a man who identified himself as Johnson's son. The officers explained that Daniel Johnson was under arrest and asked Daniel Johnson's son, Damir Johnson, if they could come in. Damir Johnson allowed the officers in. He was briefly handcuffed for officer safety while officers checked for additional people in the apartment. Once officers determined that no other individuals were in the apartment, the handcuffs were removed from Damir Johnson and he was brought into the front room of the apartment. Officer Clark and another special agent explained to Johnson's son why they were there and that they were not at the apartment to investigate

him. Officers also verbally asked Damir Johnson if they could search the apartment and they informed Damir Johnson that he was not required to consent to the search. Officer Clark testified that Johnson's son "gave us verbal approval to search the property." (*Id.* at 65.) At that time, the search of the property commenced. Damir Johnson directed law enforcement to the rear bedroom, where Daniel Johnson resided.

Officer Clark and Special Agent Tyler Hanna agreed that they should get a written consent form, and Special Agent Hanna left the apartment to get the form. Special Agent Hanna returned with the consent to search form, which Damir Johnson read and signed at 6:35 p.m. Thus, according to Officer Clark, the search did not commence until after officers got verbal permission from Damir Johnson, but the search was ongoing when Johnson's son provided written consent, and it continued for approximately twenty minutes thereafter.

On a shelf in an open closet right outside of Daniel Johnson's bedroom, officers found a loaded semi-automatic handgun. Inside Daniel Johnson's bedroom, officers found 126 yellow Endocet pills, thirty-seven blue Xanax pills, a bag containing marijuana, a clear jar that officers believed contained fentanyl citrate, nineteen green pills in a clear plastic baggie, approximately $1,000 in cash, two photos of Daniel Johnson, numerous blank prescriptions, and two prescriptions and one pill bottle labeled with a name other than Daniel Johnson's.

### 2.    *Damir Johnson's version of the search*

Damir Johnson tells a different story of what transpired on May 2, 2012. He claims that he was home alone and sick on that day. He testified that he first encountered police officers on that day when they were outside of his locked bedroom door. He heard people rummaging through his apartment and then officers attempting to enter his room. The officers knocked on the bedroom door

and identified themselves as police. Damir Johnson opened the door. The officers, who had their

guns raised, ordered him to raise his hands and handcuffed him. Eventually Damir Johnson was

brought out to the couch in the living room. According to Damir Johnson, he did not open the door

to his apartment to the officers on May 2, 2012. He reported that as officers were questioning him,

they were "roaming around, searching our apartment, kitchen, living room, bedrooms." (*Id.* at 100.)

He estimated that the apartment was searched for forty-five minutes to an hour and claims that he

was not asked to consent to the search. Indeed, the first time his permission to search was sought was

when he was informed that officers had a paper for him to sign. He was purportedly told, "we have

a paper for you to sign to say that we have consent to search, and if you don't sign it, we'll come

back with a warrant, and you'll be arrested for anything we find in the house." (*Id.* at 101.) He claims

that the search was completed at the time he was presented with the form to sign. According to

Damir Johnson, his name was on the lease for the apartment.

## II.    DISCUSSION

### A.    Consent to Search

#### 1.    Legal framework

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The

Fourth Amendment's primary concern is reasonableness. *See Florida v. Jimeno*, 500 U.S. 248, 250

(1991). Searches conducted without prior approval of a judge or magistrate are per se unreasonable,

subject to certain exceptions. *See California v. Acevedo*, 500 U.S. 565, 580 (1991). As a man's home

is his castle, the home "occupies a sacrosanct place in our Fourth Amendment jurisprudence." *United*

*States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012). Thus, a warrantless search of an individual's home is per se unreasonable. *See Payton v. New York*, 445 U.S. 573, 586 (1980).

If an individual consents to a search, neither a warrant nor probable cause is required. *See United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011). An individual whose property is to be searched can consent to a search, as can a third party who has common authority over the premises. *United States v. Matlock*, 415 U.S. 164, 171 (1974). "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170. The Third Circuit has explicitly stated that common authority rests not on property rights but rather on mutual use of the property by individuals with joint access or control such that it is reasonable to recognize that any of the cohabitants can permit a search and that all cohabitants have assumed the risk that one of them may agree to a search of a common area. *Stabile*, 633 F.3d at 230-31.

The consent must be voluntary and the individual giving consent must also possess the authority to do so. *Stabile*, 633 F.3d at 230. The voluntariness of an individual's consent is determined by examining the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). However, consent may be given "unintentionally and without knowledge of the right to refuse consent." *United States v. Claus*, 458 F. App'x 184, 189 (3d Cir. 2012). When deciding if an individual voluntarily consented to a search, courts should consider the age, education, and intelligence of the individual, whether the individual was advised of his or her constitutional rights, the length of the encounter, the repetition or duration of the questioning, the use of physical punishment, the setting in which the consent was obtained, and the parties' verbal and non-verbal actions. *See United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). The burden rests with the

7

Government to prove by a preponderance of the evidence that the consent was voluntary. *See Matlock*, 415 U.S. at 177 n.14; *see also Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

        *2.      Verbal consent*

      This case hinges on the credibility of the witnesses who testified at the suppression hearing. If the testimony of Officer Clark is credited, Daniel Johnson's motion rises or falls on whether Damir Johnson's consent to a search of the apartment was voluntary. Damir Johnson clearly had the authority to consent to a search of his apartment because he lived in the apartment that officers searched. *See United States v. Tucker*, 57 F. Supp. 2d 503, 514 (W.D. Tenn. 1999) (concluding that inhabitant of an apartment possessed actual authority to consent to search of a hall closet because she had joint access or control over it); *see also Stabile*, 633 F.3d at 231 (concluding that cohabitant who used property and exercised joint access and control over house could consent to search of house). Furthermore, a parent-child relationship gives rise to a presumption of control of property. *See United States v. Rith*, 164 F.3d 1323, 1330-31 (10th Cir. 1999).

      The Court, however, credits the testimony of Damir Johnson on the issue of consent to search and therefore concludes that the Government failed to sustain its burden that officers obtained verbal consent to search the apartment at 1730 West Girard Avenue. There are troubling holes and questions in the story told by law enforcement that lead the Court to this conclusion. For example, the Government offers no explanation as to how officers entered the building at 1730 West Girard Avenue. It is undisputed that officers recovered two keys from Daniel Johnson. The PARS states that the keys recovered "opened the residence at 1730 W. Girard and the apartment." (Gov't Suppression Hr'g Ex. 5 [PARS].) Officer Clark testified that he and other officers went to the Johnsons' apartment on the third floor, that the officers knocked on the door and Damir Johnson opened the

8

door and let the officers into the apartment. (Suppression Hr'g Tr. at 65.) Officer Clark, however,

could not recall how the officers gained access to the front door on the first floor of the property. (*Id.*

at 84.) Officer Clark was unsure if somebody buzzed the officers into the apartment building or if

they used the keys they had recovered from Daniel Johnson. (*Id.*) Special Agent Hanna could shed

no light on how officers entered the building, as they were already on the scene when he arrived. (*Id.*

at 116.) He was also unable to recollect how he knew to go to the third floor. (*Id.* at 116-17.) He

testified that the door to the Johnsons' apartment was "wide open," and that he encountered Damir

Johnson in his bedroom before Damir Johnson was brought out. (*Id.* at 113, 117.) Officer Clark, who

was one of the first officers on the scene and was there when Damir Johnson purportedly opened the

door to the apartment, said nothing about Damir Johnson being in his bedroom. Rather, Officer Clark

reported that after officers determined that no one else was in the apartment, Damir Johnson was

unhandcuffed and "brought into the front room of the apartment." (*Id.* at 65.)

      This testimony is consistent with Damir Johnson's version of the events that he did not let

law enforcement into the apartment but that they were already present in the residence when they

first encountered Damir Johnson. It is reasonable to conclude that officers used Daniel Johnson's

keys to both gain access to the apartment building and to gain access to the actual apartment. Damir

Johnson's story is also consistent with Special Agent Hanna's testimony that he first encountered

Damir Johnson in his bedroom. Officer Clark testified that after Damir Johnson opened the door, he

was briefly handcuffed. Once officers ascertained that no other people were in the apartment, the

handcuffs were taken off and Damir was brought into the living room of the apartment. (*Id.* at 65.)

If, however, Damir Johnson opened the door to the apartment as Officer Clark testified, that would

mean that officers would have permitted Damir Johnson to return to his bedroom, most likely while

handcuffed, only to later be brought out to the living room, where the handcuffs were removed. But there was no testimony from Officer Clark that Damir Johnson was in his bedroom, or that he was allowed to enter his bedroom once officers were in the apartment. The Government points out that "officers could have simply brought Damir from the front door to his bedroom—applying handcuffs at some point while clearing the apartment—and then brought him to the couch and uncuffed him." (Gov't's Supplemental Resp. to Def.'s Suppression Mots. at 4 n.5.) This argument highlights the flaw in the Government's case against suppression because this argument is presented as testimony by a Government attorney contained in a footnote in a supplemental brief. Nobody on the scene testified that what the Government posits actually occurred. A warrantless intrusion into one's home requires better recall.

Furthermore, the testimony of law enforcement is called into question by the timing of the recovery of the gun. Special Agent Hanna testified that he had to return to his office because he did not have a consent to search form with him. This puts into question the time that the gun was recovered. Damir Johnson signed the written consent to search form at 6:35 p.m., the exact time that the PARS claims that evidence, including the gun, had been located. But Special Agent Hanna said that the gun was recovered prior to 6:35 p.m. These inconsistencies call into doubt what actually occurred on May 2, 2011, at 1730 West Girard Avenue, Apartment 3. After listening to the testimony and reviewing the evidence, it seems that what most likely occurred is that officers used Johnson's keys to enter the building and his apartment and while searching the apartment, they encountered Damir Johnson in his bedroom. It was only after they searched the apartment that they presented him with a consent to search form.

The Court's conclusion also rests on the decision to have Damir Johnson sign a written

10

consent to search form after the search had already began. Why have him sign the written consent if officers were comfortable that they had obtained valid verbal consent from Damir Johnson? Perhaps their actions can be ascribed to a belt and suspenders approach. Yet given the story outlined here, it is more likely that officers were already searching the apartment and had not obtained consent from Damir Johnson at the time they presented him with a written consent to search form. Indeed, Officer Clark testified that the search commenced before he was presented with a written form and it ended after Damir Johnson signed the written consent form. (Suppression Hr'g Tr. at 86-89.)  The Court does not question that a search was undergoing prior to Damir Johnson signing the form but does not find credible the testimony that Damir Johnson had verbally consented to a search prior to the commencement of the search of the apartment.

The Court also finds it odd that Officer Clark's PARS, which contains a detailed account of the events leading up to Johnson's arrest, as well as the search of his apartment, makes not a single reference to obtaining verbal consent from Damir Johnson. Nor does it mention that officers did not have a written consent form with them and that Special Agent Hanna had to leave the scene, obtain a form, and return. The PARS states only that Damir Johnson "signed  a federal consent to search of the residence. Damir Johnson was advised that this was voluntary and that he could refuse. Damir Johnson signed the consent." (PARS.) The Government also failed to call the special agent whom Officer Clark testified "was there with me when we did the verbal consent." (Suppression Hr'g Tr. at 67.) Thus, Officer Clark's testimony regarding Damir Johnson's verbal consent is uncorroborated, not mentioned in his report of the incident, and marred by inconsistencies with other testimony adduced at the hearing.

The Government also argues that "[t]he fact that keys were recovered fails to establish that

those keys were used by the officers to gain entry to the residence and the apartment." (Gov't's Supplemental Resp. to Def.'s Suppression Mots. at 3 n.4.) That is a true statement. The PARS is ambiguous on the point because it does not indicate when officers discovered that the keys recovered from Daniel Johnson opened the apartment building and the apartment, nor does it indicate whether officers learned of this fact by using the keys or by some other means, perhaps by Daniel Johnson telling them what the keys were used to open. This is a search of an apartment without a warrant and involving no exigent circumstances. The Government bears the burden of showing the reasonableness of the search, and its failure to establish how officers gained access to the building, despite numerous officers being present on the premises, raises serious doubts about the credibility of law enforcement's tale about the search of the Johnsons' apartment. It leads this Court to believe that officers were already inside of the apartment and had begun searching the apartment before they encountered Damir Johnson. The Court concludes that Johnson never provided verbal consent to the search of his apartment.

3.    *Consent obtained after illegal law enforcement action*

Although the Court concludes that Damir Johnson did not give his verbal consent to the search of his apartment, he signed a form consenting to the search of his apartment. It is uncontested that officers were searching the apartment at the time he signed the written consent form. Thus, Damir Johnson's signature was not a voluntary consent to search. Rather, the actions of law enforcement evinced an attempt to correct an illegal search. The intrusion was complete, the Fourth Amendment already violated. This Court cannot condone such overreaching by allowing police officers to obtain consent after the fact and turn an illegal entry and unreasonable home search into a permissible consent search.

Even assuming officers obtained some type of voluntary consent to search the apartment from Damir Johnson, however, the Court concludes that such consent was obtained after law enforcement had already violated the Fourth Amendment by entering the apartment and searching the residence without a warrant and without an exception to the warrant requirement that would justify their actions. "When a consensual search is preceded by a Fourth Amendment violation, as in this case, the government must prove not only the voluntariness of the consent under the totality of the circumstances, but the government must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994). Consent following an illegal seizure can purge the taint of the illegality for Fourth Amendment purposes, but the Government "must show sufficient attenuation to causally disconnect the consent from the seizure." *United States v. Mosley*, 454 F.3d 249, 261 n.19 (3d Cir. 2006).  To determine whether consent purged the taint of the illegality for Fourth Amendment purposes, courts consider a number of factors including: (1) the temporal proximity between the consent to search and the Fourth Amendment violation; (2) the existence of intervening circumstances; and (3) the purpose and flagrancy of the officer's misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *United States v. Fraguela-Casanova*, 858 F. Supp. 2d 432, 451 n.33 (M.D. Pa. 2012).

Given the facts of this case and the applicable legal framework, the written consent obtained by Officer Clark and Special Agent Hanna remains tainted and the items obtained in the apartment cannot be used against Daniel Johnson. The written consent was obtained while an illegal search was underway in the Johnsons' apartment and only shortly after law enforcement violated the Fourth Amendment when they entered the apartment without a warrant. The Government can point to no intervening circumstances that would have purged the taint of the illegal entry. Finally, the Court

13

concludes that presenting Damir Johnson with a written consent form was done in an attempt to erase a warrantless entry into an individual's residence, a clear violation of the Fourth Amendment. Thus, even granting that Damir Johnson voluntarily consented to a search of the apartment where he and Daniel Johnson lived and that certain evidence was seized after he did so, that consent was obtained virtually simultaneously with an illegal entry into the Johnsons' apartment. It thus remains tainted as the fruit of the poisonous tree and must be excluded. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963).

### B.    Suppression of Daniel Johnson's Statements and Seizure of His Cell Phone

Also before the Court is Daniel Johnson's motion to suppress the statements he made to officers after he learned that officers found a gun in his apartment. Johnson additionally seeks to suppress any evidence from his cell phone, of which he now claims he consented to a search only after confronted with illegally obtained evidence.  In his original motion to suppress, Johnson argued that his waiver of his *Miranda* rights was not voluntary and thus the statements he made to Special Agent Coleman must be suppressed. He also contended that the officers failed to obtain knowing and intelligent consent prior to searching Johnson's cell phone.

A waiver of one's *Miranda* rights must be made "voluntarily, knowingly and intelligently" based on the totality of the circumstances. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Arizona v. Fulminate*, 499 U.S. 279, 285 (1991). The voluntariness of a waiver depends upon the absence of police overreaching. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). To determine whether a waiver was voluntary, knowing, and intelligent, two conditions must be met. First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S.

14

412, 421 (1986). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." *Connelly*, 479 U.S. at 168.

Based on the most recent briefing this Court received following the suppression hearing, Daniel Johnson appears to have abandoned the argument that his statements to Special Agent Coleman should be suppressed because the waiver of his *Miranda* rights was not knowing and intelligent, as well as his argument that data from the cell phone should be suppressed because officers lacked valid consent from Johnson to search his cell phone. Rather, Johnson seeks suppression of his statements and evidence from his cell phone because they arose from the illegal search of his apartment and are therefore the fruit of the poisonous tree. (Def.'s Mem. of Law Supporting Mot. to Suppress at 14-16.)

The admissibility of the statements made by Daniel Johnson following the discovery of contraband in his home presents a closer question than does the evidence obtained during the illegal search of his apartment. For one, Daniel Johnson was not in his apartment when it was being illegally searched. Additionally, the incriminating statements he made to Special Agent Coleman followed a waiver of his *Miranda* rights. Nonetheless, the Court concludes that the statements Daniel Johnson provided to Special Agent Coleman must be suppressed as the fruit of the poisonous tree. Daniel Johnson has no basis, however, for suppressing the data obtained from the cell phone.

       *1.    Statements*

The fact that a Fourth Amendment violation occurred does not mean that the evidence

obtained must be suppressed. Rather, suppression is warranted only if it will deter future Fourth Amendment violations. *United States v. Davis*, 131 S. Ct. 2419, 2426-28 (2011). The question for this Court is whether, granting the illegal search of his apartment, the incriminating statements and search of the cell phone were the result of "exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *See Wong Sun*, 371 U.S. at 487-88.

Special Agent Coleman testified that prior to Johnson receiving and waiving his *Miranda* warnings, he overheard that a gun was found in the apartment. (Suppression Hr'g Tr. at 48-49.) Daniel Johnson was only questioned after officers found evidence of illegal activity in his apartment. Illegally obtained evidence was thus largely responsible for the interview with Daniel Johnson. The Government offers no reason for this Court to find that Daniel Johnson's confession was freed of the illegal search which occurred almost simultaneously with the interview of Daniel Johnson. *See Brown*, 422 U.S. at 604 (the burden rests with government to show admissibility of statements obtained after illegal search).

The *Miranda* warnings given to Daniel Johnson are an important factor that this Court must consider in deciding whether the taint was purged. *Id.* at 603. The fact that Daniel Johnson received *Miranda* warnings, however, does not by itself remove the taint of the illegal search. *See id.* at 602-03 ("But the Miranda warnings, alone and per se, . . . cannot assure in every case that the Fourth Amendment violation has not been unduly exploited."). Based on the facts of this case, the Court cannot say that Daniel Johnson's statements and his consent to the search of his cell phone were acts of free will independent of the illegal search of his residence. *Cf. United States v. Parker*, 469 F.3d 1074, 1079 (7th Cir. 2006) (concluding that consent to search was an intervening circumstance because it was an act of free will independent of the defendant's arrest, even if that arrest was

16

illegal). The statements were obtained almost simultaneously with the Fourth Amendment violation with no intervening circumstances.

Furthermore, this violation was too flagrant to admit the evidence. Officers illegally entered Johnson's home, searched his room and belongings, and then attempted to bless this conduct by seeking consent after the fact from Daniel Johnson's son. This is exactly the type of conduct the exclusionary rule aims to deter. Finally, the conduct here is particularly unreasonable because it was unnecessary. If law enforcement had taken the simple step of seeking a warrant to search Daniel Johnson's apartment, any evidence obtained could have been used against him. Officers watched Johnson conduct a drug transaction and arrested him. Officers could have driven Johnson to his apartment and presented a probable cause affidavit to a judge prior to searching the apartment. The record provides no indication that officers feared Johnson's son would destroy evidence or jeopardize their investigation. And if officers had that concern, they could have secured Damir Johnson while they waited to obtain a warrant.

The Government has not sustained its burden to show that the taint of the illegal conduct had dissipated such that the statements from Daniel Johnson may be admitted against him.

## 2. Cell phone

The search of Daniel Johnson's cell phone presents a different issue. If the only consent Special Agent Coleman obtained were the written consent form that Daniel Johnson signed after the interview was completed, the Court would also suppress that evidence. This is not the case. Special Agent Coleman testified that Daniel Johnson verbally consented to a search of his cell phone while he was driving Daniel Johnson from the Rite-Aid to Daniel Johnson's apartment. (Suppression Hr'g at 24.) The Court finds Special Agent Coleman credible on this point. At the time Special Agent

Coleman obtained verbal consent to search Daniel Johnson's cell phone, no Fourth Amendment

violation had occurred. Thus, the cell phone search is not the fruit of the poisonous tree. On the

contrary, Daniel Johnson verbally consented to the search of his cell phone, which he was free to do.

*See United States v. McGlothin*, 391 F. App'x 542 (7th Cir. 2010) (refusing to suppress verbal

consent search of cell phone); *see also United States v. Martinez*, 771 F. Supp. 2d 378 (E.D. Pa.

2011) (approving verbal consent to cell phone search).


## III.   CONCLUSION

Law enforcement exceeded the clear bounds of the law when it searched Daniel Johnson's

apartment. To deter future violations, exclusion is the remedy warranted here. Defendant's motion

to suppress evidence obtained during the search as well as his statements made after he was read his

*Miranda* rights is granted. Daniel Johnson voluntarily consented to the search of cell phone,

however, and that evidence will not be suppressed. An Order consistent with this Memorandum will

be docketed separately.